# PECHMAN LAW GROUP PLLC
### ATTORNEYS AT LAW

**488 MADISON AVENUE**
**NEW YORK, NEW YORK 10022**
**(212) 583-9500**
**WWW.PECHMANLAW.COM**

February 7, 2019

**VIA ECF**

Honorable Vernon S. Broderick
United States District Judge
United States District Court
Southern District of New York
40 Foley Square, Room e415
New York, New York 10007

    Re:    *Pauta v. AJC Jewelry Contracting Corp. et al.*,
             No. 18 Civ. 6001 (VSB) (KNF) – *Cheeks* Letter-Motion

Dear Judge Broderick:

We represent Esteban Pauta ("Plaintiff" or "Pauta") in the above-referenced wage-and-hour action against AJC Jewelry Contracting Corp. d/b/a AJC Jewelry Contracting ("AJC"), Dion L. Smith, and Leo Smith (collectively, "Defendants," and collectively with Pauta, the "Parties"). The Parties jointly submit this letter-motion seeking approval of their settlement agreement (the "Agreement," enclosed as Exhibit 1). Per the Agreement, Defendants will pay Pauta $26,400.00 (the "Settlement Amount") to settle his claims under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), the New York Labor Law ("NYLL"), and the Wage Theft Prevention Act ("WTPA"). For the reasons discussed in detail below, as well as those set forth in the accompanying Declaration of Louis Pechman, the Court should approve the settlement as fair and reasonable and retain jurisdiction over this matter for purposes of enforcing the Agreement.

## FACTUAL AND PROCEDURAL HISTORY

On January 2, 2018, Pauta, through counsel, mailed AJC a demand letter enclosing a draft complaint. Initial settlement discussions with Defendants' former counsel failed, and Plaintiff filed his Complaint on July 2, 2018. ECF No. 1. It was served on Defendants on August 6, 2018. ECF Nos. 12–14. In the Complaint, Pauta claims Dion L. Smith and Leo Smith own, operate, and manage AJC, a jewelry store in Manhattan whose annual gross revenues exceeded $500,000.00 from 2015 to 2017. Pauta worked as a jeweler at AJC from approximately July 6 to November 1, 2017.

The Complaint states that Defendants always paid Pauta $15.00 per hour worked, including for hours worked over forty per workweek. Pauta claims Defendants should have paid him $22.50, equal to $15.00 multiplied by 1.5, per overtime hour worked. Accordingly, Pauta claims Defendants owe him the difference between the two rates, or

$7.50, per overtime hour worked. For example, Pauta claims he worked 80.30 hours and was paid $1,204.50, equal to $15.00 multiplied by 80.30 hours, in the workweek of September 14 to 20, 2017. ECF No. 1 ¶¶ 34–35. For this workweek, Pauta claims Defendants owe him $302.25 in unpaid overtime wages, equal to $7.50 multiplied by 40.30 overtime hours worked. *Id.* ¶¶ 36–37.

The Complaint also alleges that Defendants fired Pauta in response to his complaints about their failures to pay him overtime wages at the correct rate throughout his employment and any wages at all throughout his last two workweeks, when Pauta's paychecks bounced. Finally, Pauta claims that Defendants did not furnish him with a wage notice at the time of his hiring or with wage statements (*i.e.*, paystubs) with each payment of his weekly wages. Upon these facts, Pauta brought this action to recover unpaid overtime wages, regular wages (for his last two workweeks at AJC when his paychecks bounced), statutory damages under the WTPA for failure to receive a wage notice and paystubs, damages for alleged retaliation, interest, liquidated damages, and attorneys' fees and costs under the FLSA, NYLL, and WTPA.

On August 22, 2018, Defendants' current counsel contacted Pauta's attorneys, Pechman Law Group PLLC ("PLG"), to discuss the action and request an extension of time to file Defendants' Answer. *See* ECF No. 15 (stipulation). On September 17, 2018, defense counsel produced AJC's payroll records for Pauta. Thereafter, on September 24, 2018, PLG sent defense counsel damages calculations and a settlement demand subject to Federal Rule of Evidence 408. Defendants provided a settlement offer on September 27, 2018, to which Plaintiff responded on the same day.

On September 28, 2018, Defendants filed an Answer, in which they generally denied the material allegations in the Complaint and claimed, *inter alia*, that "Plaintiff was not terminated nor retaliated against but simply did not return or appear for work." ECF No. 12 at 5. By Order dated October 23, 2018, the Court referred this case to Magistrate Judge Kevin N. Fox for settlement purposes and directed the Parties to submit a joint initial pretrial conference letter by December 7, 2018, in anticipation of the conference scheduled for December 14, 2018. ECF Nos. 18–19. As directed, the Parties submitted the letter on November 13, 2018. ECF No. 20. In it, the Parties stated that they would work together to attempt to resolve their disputes. *See id.* ¶ 7. The settlement conference was ultimately scheduled for January 3, 2019. ECF No. 22. To give the Parties an opportunity to settle the dispute before attending a conference before this Court, the initial pretrial conference was postponed to January 10, 2019. ECF No. 24. The Parties exchanged initial disclosures, pursuant to Rule 26(a)(1), in late December 2018.

On January 3, 2019, the Parties and their counsel participated in a 2.5-hour long settlement conference before Magistrate Judge Fox. The Parties discussed all claims and defenses, facts at issue, and Pauta's potential damages. Notably, at the conference and for settlement purposes only, Defendants shared significant financial information, including personal and corporate tax returns and bank statements, showing that they are in a precarious financial condition and cannot withstand a large judgment. With the help of Magistrate Judge Fox, the Parties ended the conference by stating all of their settlement terms on the record, which they subsequently reduced to the Agreement.

By joint letter-motion dated January 7, 2019, the Parties requested that the Court postpone the initial pretrial conference *sine die* in light of their settlement in principle. ECF No. 25. By Order dated January 8, 2019, the Court granted the request and directed the Parties to submit the Agreement and other documents for review. ECF No. 26. Pursuant to the Court's Order and *Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199 (2d Cir. 2015), the Parties submit this Joint Letter-Motion, with the enclosed executed Agreement, requesting that the Court approve their settlement as fair and reasonable and retain jurisdiction over this action for purposes of enforcing the Agreement.

## THE SETTLEMENT IS FAIR AND REASONABLE

The Agreement resolves bona fide disputes over sharply contested issues, namely whether Pauta was fired or simply ceased to report to work. The Parties accept the Agreement as a fair and reasonable resolution of what otherwise would be an expensive and prolonged litigation. To avoid additional litigation expenses and uncertainty, especially in light of Defendants' financial challenges, Defendants will pay Pauta $26,400.00 (the "Settlement Amount"), which exceeds all unpaid wages that Pauta could expect to recover under the FLSA and NYLL should he be fully successful at trial.

Following lengthy negotiations before Magistrate Judge Fox, the Parties agreed to settle this matter in large part to avoid costly litigation. Defendants claim they never retaliated against Pauta. According to them, Pauta's former co-workers are ready to testify that he neither complained about his wages nor was fired. Rather, Pauta simply failed to report to work even though Defendants contacted him in or about mid-December 2017 about returning to work. Pauta admits that Defendants offered him to return to work in or about mid-December 2017, but he otherwise denies their claims and argues that some of his former co-workers would provide testimony favorable to him. This issue would have to be resolved through discovery, including various depositions. The Parties would then engage in dispositive motion practice. Given the fact-intensive nature of the dispute, a jury would most likely have to resolve it. Appeals could follow. Proceeding with the litigation would consume significant amounts of time and resources, almost certainly including most, if not all, of the Settlement Amount.

The Parties were especially interested in avoiding litigation costs in light of Defendants' precarious financial condition. At the settlement conference, Defendants shared information and documents reflecting that they have been operating AJC at a loss, that they have several outstanding liabilities, that they lack significant assets against which Pauta can collect a judgment, and that, in sum, prolonged litigation, especially if it results in a significant judgment against them, would drive them to bankruptcy. These circumstances strongly favor approval of the Parties' settlement. By settling, the Parties are choosing to cut their losses to ensure an outcome that they can both accept and control. *See, e.g.*, *Cortes v. New Creators, Inc.*, No. 15 Civ. 5680 (PAE), 2016 WL 3455383, at *4 (S.D.N.Y. June 20, 2016) ("In light of defendants' precarious financial condition . . . there is a substantial risk that any judgment plaintiff[] might obtain at trial would prove uncollectable."); *Meza v. 317 Amsterdam Corp.*, No. 14 Civ. 9007 (VSB), 2015 WL 9161791, at *1 (S.D.N.Y. Dec. 14, 2015) (approving settlement where amount paid was approximately 16% of plaintiffs' highest potential recovery but defendant faced

significant financial difficulties); *Lliguichuzhca v. Cinema 60, LLC*, 948 F. Supp. 2d 362, 365 (S.D.N.Y. 2013) ("Case law recognizes that potential difficulty in collecting damages militates in favor of finding a settlement reasonable.").

Despite Defendants' financial difficulties, the Settlement Amount represents a fair and reasonable compromise and the result of extensive arm's length negotiations. Using AJC's payroll and time records, PLG calculated Pauta's highest potential damages for his employment period (July 6 to November 1, 2017) and for his retaliation claims as follows:

**Employment Period**
- Unpaid Overtime Wages: $3,372.56
- Unpaid Regular Wages: $1,200.00
- Liquidated Damages: $4,572.56
- NYLL Interest: $564.87
- WTPA Damages: $9,700.00
- **TOTAL**: $19,409.99

**Retaliation Claims**
- Retaliation Wages: $18,854.80
- Liquidated Damages: $18,854.80
- **TOTAL**: $37,709.60

As noted, Defendants dispute that Pauta is entitled to recover any retaliation damages. If they were successful, Pauta would not recover any retaliation damages, and so the Settlement Amount would exceed his highest potential damages for the employment period by almost $7,000.00. Nevertheless, even assuming Pauta were fully successful at trial, his highest potential recovery of unpaid wages (without liquidated or other damages) would be $23,427.36, almost $3,000.00 less than the Settlement Amount.

If a jury were to find a middle ground between the Parties' positions and award Pauta retaliation damages only until mid-December 2017, when he was allegedly contacted to return to AJC, his total unpaid retaliation wages would be approximately $3,400.00 plus an equal amount in liquidated damages, totaling approximately $26,200.00 for all damages. This is essentially equal to the Settlement Amount. Notably, if his retaliation claims failed, Pauta can recover only $6,745.12 under the FLSA,[1] almost $19,500.00 less than the Settlement Amount. In short, the Settlement Amount either exceeds or far exceeds Pauta's highest potential recovery of unpaid wages.

With the help of Magistrate Judge Fox, the Parties agreed that Defendants would pay Pauta the Settlement amount in twelve (12) monthly installments from March 2019 to February 2020, with each installment of $2,200.00 due by the first day of each month. Ex. 1 § 1(c). The Agreement's terms are otherwise consistent with *Cheeks*. For example, the release in the Agreement is limited to Pauta's wage-and-hour claims. *Id.* § 2. There are no confidentiality or non-disparagement provisions. *See generally id.*

As a fair and reasonable settlement that was negotiated at arm's length, the Agreement contains provisions that help to ensure that Defendants pay the Settlement Amount. First, if Defendants default on their payment obligations and fail to cure the

---

[1] Pauta's claim for unpaid regular wages (*i.e.*, his first 40 hours worked but not paid in his last two weeks) is brought under the NYLL. ECF No. 1 ¶¶ 78–82. For his employment period, Pauta could recover unpaid overtime wages of $3,372.56 plus an extra equal amount as liquidated damages under the FLSA.

default within five business days, Defendants will have to pay the sum of (i) all outstanding installments under the Agreement, including any bounced check fees, (ii) liquidated damages of $10,000.00, and (iii) all reasonable attorneys' fees and costs Pauta incurs in enforcing the Agreement. *Id.* § 1(d). Second, as part of the settlement, the Parties jointly request the Court retain jurisdiction over this matter for purposes of enforcing the Agreement's terms in the event of such default. *Id.* § 3(b).

The Settlement Amount is reasonable because, even after deducting attorneys' fees and costs, Pauta will receive $17,223.34. *Id.* § 1(a)(i). That is, even after attorneys' fees and costs, Pauta will receive approximately 74% of his highest potential unpaid wages if he were fully successful at trial and 89% of his highest possible damages for *all* claims (including WTPA claims, liquidated damages, and interest) in the employment period. In light of the disputes underlying the retaliation claims and Defendants' financial condition, as discussed above, Pauta's recovery is significant and plainly the result of good faith negotiations.

Pursuant to the retainer agreement between Pauta and counsel, PLG's fees are $9,176.66, which equals 33.33% of the Settlement Payment after reimbursement of costs incurred in the prosecution of this action.[2] *Joseph v. Otg Mgmt.*, No. 16 Civ. 2052 (VSB), at *4 (S.D.N.Y. June 27, 2017) ("Courts regularly approve attorney's fees of one-third of the settlement amount in FLSA cases."); *Meza*, 2015 WL 9161791, at *2 (same) (Broderick, J.). PLG's lodestar to date is approximately $19,500.00. *See* Ex. 2. As such, we believe that the contingency fee in this case is fair and reasonable, particularly because it is lower than the lodestar and because Pauta voluntarily accepts it after having reviewed every term of the Agreement in Spanish, his native language, with counsel. *See* Agreement §§ 8, 13(a).

We thank the Court for its time and consideration of this matter. If the Court needs any additional information for purposes of *Cheeks* review, please feel free to contact us.

                                                Respectfully submitted,

                                                *s/ Gianfranco J. Cuadra*
                                                Gianfranco J. Cuadra

cc: Jason J. Rebhun, Esq.

Enclosures

---

[2] Costs incurred are $400.00 for the Court's filing fee and $165.00 for service of process fees. *See* ECF Nos. 12–14 (reflecting $55.00 for service fee per defendant, for total of $165.00). As the Court directed in its Order (ECF No. 26), a copy of PLG's contemporaneous billing records for all attorneys who worked on this matter is enclosed to the accompanying Declaration of Louis Pechman for the Court's review.